IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 18-10068 |
| | ) | |
| TYLER WATSON, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America hereby submits its sentencing recommendation, as follows. The defendant, Tyler Watson, is a predator who sexually exploits minors. He manipulates vulnerable children, both those to whom he has direct access or personal contact, and those to whom he can reach out over the internet. Specifically, this defendant took advantage of a minor known to him, and in his care, to create sexually explicit images. He also used Facebook to entice other minors into producing and sending him child pornography online.

On August 19, 2019, the defendant pleaded guilty to two counts of production of child pornography and one count of possession of child pornography. As a result of this plea, the defendant faces an aggregate statutory maximum sentence of eighty years imprisonment, with a mandatory minimum sentence of fifteen years of imprisonment, to be followed by a period of supervised release between five years and life. The

Government agrees with the Guidelines calculation as put forth by in the Presentence Investigation Report, ECF No. 35. A guideline sentence is amply justified by an analysis of the factors set forth in 18 U.S.C. § 3553(a), and would provide just punishment and adequate deterrence for the defendant's serious offense conduct.

I.   **The Guideline Calculation**

The United States Probation Office (USPO) has calculated the defendant's total offense level, after all appropriate adjustments and enhancements, to be 43. PSR at 14. In his plea agreement, the defendant stipulated, pursuant to USSG §1B1.2(c), that the facts stated in the plea agreement constitute both the nature and circumstances of the offense and relevant conduct under USSG §1B1.3, and that the Court can use these facts in calculating the defendant's sentence pursuant to the Sentencing Guidelines. See ECF No. 19 at 9-10. In accordance with this stipulation and pursuant to USSG §2G2.2(c)(1), USPO has applied a cross-reference to USSG §2G2.1 on the possession count. PSR at 13. This cross reference is based on the defendant's relevant conduct in using Minor Victim 2 to create sexually explicit images. Id. Thus, the base offense level for each of the three counts of conviction is 32. Id at 12-13.

The defendant has received appropriate enhancements due to the age of Minor Victim 1, the fact that Minor Victim 1 was in his custody or care, and because the offense conduct involved the commission of sexual contact. Id. A Chapter Four enhancement pursuant to USSG §4B1.5(b)(1) is appropriate as well, because the defendant engaged in a pattern of activity involving prohibited sexual conduct, to wit

2

the production of child pornography. Id at 14. The defendant's criminal history score places him in category I. Id at 15. Accordingly, the Guidelines range comes out as a lifetime sentence, capped by the aggregate statutory maximum of eighty years (960 months). Id at 19.

### II. The Sentencing Factors under § 3553(a)

Under 18 U.S.C. § 3553(a), when imposing a sentence, the Court should consider (1) the nature and circumstances of the offense, (2) the history and characteristics of the defendant, (3) the need for the sentence imposed to promote the goals of sentencing, (4) the kinds of sentences available, (5) the sentencing guideline range, (6) any pertinent policy statement issued by the Sentencing Commission, (7) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, and (8) the need to provide restitution to any victims of the offense.

#### A. Nature and Circumstances of the Offense.

Tyler Watson preyed on minors for the purpose of his own sexual gratification. The defendant's abusive and exploitative conduct was varied, in that it encompassed both in-person and hands-on sexual abuse, as well as online sexual abuse. The instant offense conduct initially came to light when a friend saw nude images of Minor Victim 1 on the defendant's cellphone, while the defendant was home on leave from active duty in the Navy. The defendant had offered to babysit the six-year-old Minor Victim 1 and a ten-year-old minor for the weekend. He took both minors to a hotel with him,

3

where they stayed for the duration of the visit. Over the course of two separate days the defendant took three lascivious photos depicting Minor Victim 1, nude, with a focus on his exposed genitalia. The defendant also admitted to touching this victim's genitals while bathing him, and to knowing it was wrong. Thus, the defendant abused his position of trust as a caregiver in order to sexually exploit this minor victim.

The investigation resulting from this incident led to a subsequent investigation by NCIS, who was notified of the initial incident by the Bloomington Police Department. By way of a Command Authorization for Search and Seizure for his electronic devices and an interview of the defendant, investigators determined that Watson was trading sexually explicit material of minors with other likeminded individuals on Facebook and WhatsApp. The defendant also admitted to his conduct with Minor Victim 1 in this interview.

Moreover, a subsequent search warrant for the defendant's Facebook account information revealed that he had been communicating with multiple minors online and enticing them to send him sexually explicit images of themselves. One of these minors, Minor Victim 2, then fifteen years old, was known to him personally. Recovered Facebook Messenger conversations between the defendant and Minor Victim 2 indicate that the defendant was coercing the minor to produce sexually explicit videos for him, sending him messages such as, "1you will message me every night idgaf how…2 you will resume you picture and video Samsung's every other night starting now….Dint I dare fucking tell at me.do I make.my self. clear little boy [sic]."

The defendant's requests for such images went beyond lascivious depictions of

the genitals, as he also coerced Minor Victim 2 to record himself masturbating, which images he also received. The chat records also suggest that Watson tried to entice and coerce such images by offering gifts or money, or threatening to take away access to things he had apparently provided to the minor previously, e.g. messages he sent to Minor Victim 2 such as, "U know what u need to do to start receiving my money" and "u owe me a of lot of things if you want to jeep [sic] that phone working do I make myself clear".

The Facebook records further revealed that defendant communicated with multiple minors in the Philippines, otherwise unknown to him, from whom he enticed and/or attempted to entice images including lascivious depictions of the genitals of these minors. His communications with these victims spanned over the course of several months in one case to a year in another. In these chats, one of these victims (identified as Victim R in his impact statement for the Court) tells the defendant that he is 16 at the time they are chatting in May of 2017. In his statement, Victim R indicates that he sent "nude images" to the defendant in the course of their online correspondence. This was confirmed by the Facebook records, which revealed images sent from Victim R which depicted Victim R's exposed penis. Victim J, another victim in the Philippines, indicates in his statement to the Court that he is currently 13, and that he chatted with the defendant on Facebook in 2016 and 2017. Victim J further stated that the defendant sent him sexually explicit images of himself.

The defendant's relevant conduct illustrates his deviant sexual interested in children as young as six years old. The conduct further reveals that he is interested in

children into their teenage years. As a whole, his wide ranging interest in children renders him a danger to any minors to whom he has access, online or in person.

In fashioning the sentence, the Court should consider how the offense impacted the above-mentioned victims. The "use of children as subjects of pornographic materials is harmful to the physiological, emotional, and mental health of the child" used in the production of the pornographic material. *Osborne v. Ohio*, 495 U.S. 103, 109 (1990); *see also New York v. Ferber*, 458 U.S. 747, 758 n. 9 (1982) ("it has been found that sexually exploited children are unable to develop healthy affectionate relationships in later life, have sexual dysfunctions, and have a tendency to become sexual abusers as adults"); Shanta R. Dube et al ., *Long-Term Consequences of Childhood Sexual Abuse by Gender of Victim*, 28(5 ) Am J Prev Med, 430, 430 (2005) ("studies examining the long-term effects of childhood abuse and related stressors have found increased risk for outcomes such as substance use and misuse, psychiatric disorders, suicide, and numerous other health and social problems"). The long-term effects of such abuse, as perpetrated by the defendant, demonstrate the seriousness of the defendant's conduct.

For example, Victim R writes in his victim impact statement about how this incident affected his concentration in his studies, and how the incident still bothers him to the point of crying. This evidences how the defendant's conduct directly impacted his production victims and warrants due consideration by the Court.

Not only does the production of child pornography images have a lasting impact on victims, but the distribution and trade of such images is also devastating to victims, especially when they become aware that their images are being shared online. Images of

6

child pornography memorialize a child's abuse and exploitation and this harm is perpetuated where such images continue to circulate. "Andy," a victim from a known series whose image Watson possessed, writes in his victim impact statement:

> Since learning about the widely shared pornography, I have experienced negative changes in my life, my personality, my outlook on life and the world, and my ability to trust and interact with people. One of the main issues I deal with is anger—especially to male strangers. I am naturally suspicious, even when I see people in grocery stores or walking around my community. I fear that someone has viewed the pornography showing my abuse. I fear that I will be recognized. I struggle with extreme anger and trust issues. Some of this anger has lead me to act out aggressively—sometimes to strangers, other times to family members, friends and even though who are just trying to help me. I find it difficult to regulate my hatred, suspicions and fears. Unfortunately, to cope with my anger and to deal with the knowledge of my abuse being looked at—probably on a daily basis—I also turn to other destructive diversions such as drugs and alcohol. How else can someone live with what is happening to them over and over again? Through some therapy, I am trying to learn other coping skills but it is hard and it is a daily struggle.
> I THINK ABOUT THE CHILD PORNOGRAPHY EVERY DAY! There is not one day that goes by that I don't think, with hatred, about the sick and disgusting people who view, trade, save and "get off" on my abuse when I was just a little kid and couldn't defend myself…

Thus, the impact on the victims portrayed in images in Watsons's possession should not be discounted, and is another a factor which bears upon the serious nature of his crimes.

Indeed, aside from the victim impact, the defendant's possession related conduct also generally demonstrates his high level of engagement with child exploitation materials. In the present case the investigation revealed that the defendant had a large number of images in his possession. The National Center for Missing and Exploited

Children identified 38[1] separate known (i.e. recognized or previously identified) series among the defendant's collection of images. This number is not inclusive of all of the images he had illegally amassed, as some images came from previously unidentified series.    The defendant was also was engaged with a community of like offenders. By his own admission, the defendant was involved in the online market for child pornography, in exchanging images and communicating with those with similarly deviant interests. The forensic examination of his seized devices confirmed that he was using the WhatsApp application to trade and acquire child exploitation images from others. Furthermore, the defendant even went further to supplement his own collection with images that he himself enticed and/or produced. For these reasons, the government believes the offense conduct in this case warrants a significant sentence of incarceration.

    **B.**    **History and Characteristics of the Defendant**

The defendant is a young man who was serving on active duty with the United States Navy when he committed these crimes. Although such service would otherwise be commendable, the defendant has dishonored the uniform he wore by his egregious conduct during this period of service. The uniform he wore generally inspires trust and respect in others. However, the defendant is a wolf in sheep's clothing. Instead of serving as a role model to the children with whom he came in contact, he abused their

---

1 In this case there were two separate Child Identification Reports, one stemming from the items seized by the Bloomfield Police, and the other stemming from analysis of the items seized by NVIS. The total number of identified series between the two reports is 38, and not 35 series as indicated in the PSR.

1:18-cr-10068-JES-JEH    # 37    Page 9 of 14

trust and the trust of their parents. While on leave from service he chose to babysit Minor Victim 1, falsely portraying an act of kindness, service, and affection. He used that opportunity to take advantage of a very young boy. In such a case as this, the defendant's military service is not a mitigating factor.

Despite his lack of prior criminal history, the defendant's conduct has shown him to be a habitual offender, opportunistically preying on the young people whom he encounters. Thus, the history and characteristics of the defendant demonstrate the reasonableness of a significantly lengthy sentence.

### C. To Afford Adequate Deterrence To Criminal Conduct and To Protect the Public from further crimes of the Defendant.

The defendant's sentence must deter him from engaging in future criminal conduct and also protect the public from further crimes. His conduct demonstrates a sexual interest in children which he has indulged by exploiting multiple minors. It is thus reasonable to conclude that if given the opportunity, there is a strong likelihood that the defendant will recidivate, due to his sexual attraction to minors. According to *A Profile of Pedophilia: Definition, Characteristics of Offenders, Recidivism, Treatment Outcomes, and Forensic Issues*, Ryan C. W. Hall, M.D. and Richard C.W. Hall, M.D., P.A., Mayo Clin. Proc. 467 (April 2007), "The published rates of recidivism are in the range of 10% to 50% for pedophiles depending on their grouping." *See also H.R. Rep*. No. 107–527 at 2 (2002) ("Studies have shown that sex offenders are four times more likely than other violent criminals to recommit their crimes").

Not only has the defendant demonstrated a sexual interest in children, but he

likely will continue to do so for the rest of his life. Old age does not necessarily deter child sexual offenders. The Hall article notes that, "In a study that examined the relationship between age and types of sexual crimes, Dickey et al found that up to 44% of pedophiles in their sample of 168 sex offenders were in the older adult age range (age 40-70). When compared with rapists and sexual sadists, pedophiles comprise 60% of all older offenders, indicating that pedophiles offend in their later years at a greater rate than other sexual offenders." *Hall* at 458. *See also H.R. Rep*. No. 107–527 at 2 (2002) ("recidivism rates do not appreciably decline as offenders age"). Moreover, because the defendant used the internet to commit his crimes, including his enticement of minors and acquisition of images depicting the sexual exploitation of minors, it is even more unlikely that old age or simply not having access to minors in person would prevent him continuing to offend.

The need to protect the public therefore weighs in favor of lifetime supervised release as well. Because supervised release allows this Court to fashion appropriate conditions to monitor the defendant's conduct and provide him with beneficial treatment, it is the most useful way to address the defendant's risk of reoffending post-incarceration. Imposition of lifetime supervised release would serve to further protect the community from the defendant.

    **D.**    **The Need to Avoid Unwarranted Sentencing Disparities Among Defendants Found Guilty of Similar Conduct.**

A lengthy period of incarceration is not unreasonable here, and certainly would not be anomalous to other production convictions in federal court. For instance, in

*United States v. Russell*, the Seventh Circuit held that a sentence of 38 years imprisonment for four counts of production of child pornography was substantively reasonable. 662 F.3d 831, 854 (7th Cir. 2011). In *Russell,* the defendant created lascivious images of the genitals of his two daughters, and sexually molested one of the daughters. Id.

Further, in cases where the sentencing court specifically found that a child pornography producer (not distributor or possessor) was also a repeat child sex offender pursuant to § 4B1.5, courts have imposed sentences at the statutory maximum sentence or close to the guideline range. *See, e.g., United States v. Oberg*, 877 F.3d 261, 263 (absent the statutory maximum, the guideline sentence would have been life imprisonment on each count, given an adjusted offense level of 43 and criminal history category of I, the district court sentenced the defendant to a 30–year statutory maximum on each count under § 2251(e), to be served concurrently); *United States v. Craig,* 420 Fed. Appx. 605, 606, 2011 WL 1740145, 1 (7th Cir. 2011) (same); *United States v. Eckstrom*, 626 Fed.Appx. 640, 642 (7th Cir. 2015) (the recommended guideline range was life, the district court imposed a sentence of consecutive maximum terms of imprisonment on seven counts of producing child pornography, totaling 2,880 months (240 years); *United States v. Young,* 424 Fed.Appx. 570, 571, 2011 WL 2938078, at *1 (7th Cir. 2011) (the guidelines imprisonment range calculated to be 292 to 365 months, and the district court sentenced the defendant to 300 months); *United States v. Wheaton* 358 Fed.Appx. 742, 745, 2010 WL 21463, *2 (7th Cir. 2010) (the guideline range was life imprisonment, a sentence that the district court considered "a real possibility." Wheaton "caught a break

11

when she pleaded guilty to only one count"; the district court sentenced the defendant to the 30-year statutory maximum); *United States v. Blum,* 534 F.3d 608, 609 (7th Cir. 2008) (the district court sentenced defendant to 60 years in prison); *United States v. Shippy,* 401 Fed.Appx. 116, 118, 2010 WL 4780563, at *1 (7th Cir. 2010) (the applicable guidelines range was 360 months to life imprisonment, the district court sentenced the defendant to 40 years imprisonment); *United States v. Eyster*, 386 Fed.Appx. 180, 183, 2010 WL 2764578, 2 (3rd Cir. 2010) (defendant's sentenced of 840 months imprisonment was reasonable); *United States v. Bastian,* 603 F.3d 460, 463 (8th Cir. 2010) (the defendant was sentenced to 600 months imprisonment); *United States v. Sarras*, 575 F.3d 1191, 1209 (11th Cir. 2009) (the court sentenced the defendant to 1,200 months imprisonment); *United States v. Ferguson,* 560 F.3d 1060, 1061 (9th Cir. 2009) (the court sentenced the defendant to the statutory maximum of 480 months imprisonment). Here, the defendant has appropriately received this Chapter Four enhancement based upon the number of victims he exploited in separate instances and has not objected to it. Thus, a significant sentence is reasonable.

   **E. Restitution**

The United States requests that any restitution determination and hearing be deferred as allowed by 18 U.S.C. § 3664(d)(5). By statute, restitution shall be ordered to the victims of each count of conviction, including both the production and possession charges. *See* 18 U.S.C. § 2259. It should also be noted that as part of his plea agreement, the defendant agreed to pay restitution to all victims identified in the indictment and the plea agreement, including victims of his stipulated relevant conduct. The

Government is still working to follow up with victims of the defendant's online production in the Philippines in regard to restitution. The Government is also still awaiting potential additional requests and/or a victim impact statement from Minor Victim 1.

### III. CONCLUSION

For the foregoing reasons, the United States urges this Court to adopt the Guidelines as calculated, and to sentence the defendant to a significantly lengthy term of imprisonment, which would be substantively reasonable in light of Watson's varied and predatory offense conduct and the sentencing factors pursuant to § 3553(a).

        Respectfully submitted,

        JOHN C. MILHISER
        UNITED STATES ATTORNEY

By:   *s/ Nadia C. Prinz*
        Nadia C. Prinz

        /s/Paul Morris
        Paul Morris
        Assistant United States Attorney

CERTIFICATE OF SERVICE

  I hereby certify that on February 21, 2020, I electronically filed the forgoing motion with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the attorneys of record.

            *s/ Nadia C. Prinz*
            Nadia C. Prinz
            Trial Attorney
            United States Department of Justice
            Criminal Division
            Child Exploitation and Obscenity Section
            1400 New York Ave. NW, Suite 600
            Washington, D.C. 20005
            Phone: (202) 514-3740
            Email: Nadia.Prinz@usdoj.gov